2013 Ark. App. 429

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
Appellant

v.

**Brenda POPE, Appellee.**

**No. CV–12–1125.**

Court of Appeals of Arkansas.

June 26, 2013.

---

Tabitha McNulty, for appellant.

Friday, Eldredge & Clark, Little Rock, by: Bruce B. Tidwell, for appellee.

DAVID M. GLOVER, Judge.

RM, a mentally impaired adult under the care of Brenda Pope, a certified caregiver, sexually abused a child. The Department of Human Services Division of Adult Protective Services (DHS) found that allegations of caregiver neglect by Brenda were founded. She appealed and a DHS administrative law judge upheld the true finding of maltreatment of RM. As a consequence, Brenda's name was placed on the Adult Abuse Registry. Brenda then appealed to the Pulaski County Circuit Court, which reversed and dismissed the DHS finding, concluding that it was not supported by substantial evidence and was arbitrary, capricious, and/or characterized by abuse of discretion. The trial court ordered DHS to remove Brenda's name from any lists that it maintained. DHS now appeals, contending that the trial court erred 1) in finding that there was not substantial evidence to support DHS's finding of negligent supervision of RM and 2) in finding that DHS abused its discretion in finding negligent supervision of RM. Agency decisions, rather than circuit court decisions, are reviewed by our court on appeal. *Arkansas Dep't of Human Servs. v. Koprovic*, 2012 Ark. App. 645, 2012 WL 5438952. We reverse the agency's decision and affirm the circuit court's order.

## I. *Background*

Brenda retired after working at a DHS human-development center for twenty-eight years. She has an associate degree in health care and nursing-home administration, and she never had any employment or disciplinary problems. Brenda had also earlier served as a respite caregiver for RM. For these reasons, she was contacted by Independent Care Management (ICM) in March 2009 after an incident in his previous placement. At the time RM came to live at the Popes' home, he had been removed from an earlier placement because he had sexually abused a four-year-old child.

RM was placed in the Popes' home where Brenda and her husband, Eddie, were certified caregivers under the Medicaid-waiver program. At the time of his placement in their home, it is undisputed that Brenda told the contract supervisor, ICM, that she could not provide a child-free environment for RM because she frequently had children visiting their home. She acknowledged that she was aware of the abuse incident that caused RM's relocation to their home and that she had been advised that "he was never to be left alone around children at any time."

The incident in the Popes' home that formed the basis for the allegations against Brenda occurred in June 2010, approximately fifteen months after RM came to live with them. During this period, Brenda and Eddie had vacationed with RM in Florida, engaged him in many church activities, and entertained their five-year-old goddaughter, her parents, and other children in RM's presence. On the day of the incident, their goddaughter had come home with them after church. She had been in their home around RM numerous times before. Also at the home that afternoon was a couple who was in the process of buying Brenda and Eddie's

house. According to Brenda, she turned the television off; the child became upset and persisted in wanting to go to RM's room; and Brenda told her that she had to sit in the doorway of his room, which was approximately eight feet down the hallway from where Brenda then positioned herself so she could keep an eye on the child. Brenda got an art pad and some markers for the child. RM was sitting on his bed playing games on his laptop. At some point, Brenda noticed the child was not sitting in the doorway, and she walked into RM's bedroom where she found the child on one side of the bed at the foot and RM standing on the other side just a little way from the end of the bed. The child was on the floor on her knees with the art pad in her lap, and RM was standing beside the bed. Brenda testified that the amount of time between last observing the child in the doorway and realizing that she had moved was "a couple of minutes maybe." At that point, Brenda "had no clue" anything had happened, but at approximately 11:00 that night, she got a call from the child's mother, who told Brenda that the child had reported that RM had touched her "privates."

Brenda immediately went to RM's room and asked him what happened. He denied it at first but then "admitted to what he had done." Brenda attempted at once to contact her ICM supervisor, but could not reach her; she then contacted the area manager who worked with RM in the afternoons. The ICM supervisor was notified the next morning, and she contacted the sheriff's office. Brenda was subsequently interviewed by several persons about the incident.

Brenda testified that she works with different programs in her church involving children; that she also works with senior citizens; and that if her name remained on the Adult Abuse Registry, she would not be able to engage in those activities anymore.

On cross-examination, she explained that from where she was standing in the hallway, she "had a view of RM" and the child in the doorway as she was listening to the conversation that her husband was having with the buyers. Further, her husband went into RM's bedroom three times during this time frame to get paperwork out of a file cabinet, and she also made trips down the hall to "peek in."

Eddie testified that he was the actual designated caregiver on the day of the incident.

Clara Palmer (who worked at SE Arkansas HDC for almost 30 years) testified that RM would always require supervision around children; that she never knew he was forbidden to be around kids; that in the Medicaid-waiver program, they want to allow a person like RM the most normal setting—to live in the least restrictive setting possible; and that a normal setting involves children from time to time, with supervision.

## II. *Standard of Review*

Our review of an administrative-agency decision is governed by the Administrative Procedure Act (Ark.Code Ann. §§ 25–15–201 to –219 (Repl.2002 & Supp. 2011)). *Olsten Health Servs., Inc. v. Arkansas Health Servs. Comm'n*, 69 Ark. App. 313, 12 S.W.3d 656 (2000). We may reverse or modify an agency decision if the substantial rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are, inter alia, not supported by substantial evidence of record or are arbitrary, capricious, or characterized by an abuse of discretion. *Olsten, supra;* Ark. Code Ann. § 25–15–212(h). Arkansas Code Annotated section 25–15–212(h) more fully provides:

The court may affirm the decision of the agency or remand the case for further proceedings. It may reverse or modify the decision if the substantial rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the agency's statutory authority;

(3) Made upon unlawful procedure;

(4) Affected by other error or law;

(5) Not supported by substantial evidence of record; or

(6) Arbitrary, capricious, or characterized by abuse of discretion.

We review the entire record to determine whether there is substantial evidence to support the agency's decision and whether it is arbitrary or capricious. *Olsten, supra.* Substantial evidence has been defined as valid, legal, and persuasive evidence that a reasonable mind might accept as adequate to support a conclusion and force the mind to pass beyond conjecture. *Id.* To establish a lack of substantial evidence, an appellant is required to demonstrate that the proof before the administrative tribunal was so nearly undisputed that fair-minded persons could not reach the same conclusion. *Id.* The question is not whether the evidence would have supported a contrary finding but whether it supported the finding that was actually made. *Id.* The evidence is given its strongest probative force in favor of the administrative agency's ruling. *Id.* Administrative action may be regarded as arbitrary and capricious where it is not supportable on any rational basis. To have an administrative action set aside on this basis, the party challenging the action must prove that it was a willful and unreasoning action, without consideration, and with disregard of the facts and circumstances of the case. *Id.*

## III. *Discussion*

█ The circumstances under which the agency determined that Brenda had acted negligently, or unreasonably, can be quickly summarized. ICM came to Brenda in an emergency-type situation to obtain a new placement for RM, who everyone involved knew had been removed from his old placement because he had abused a child. It is undisputed that Brenda told them she could not provide a child-free environment for RM. It is undisputed that ICM accepted her situation and placed RM in the Popes' home anyway. It is undisputed that Brenda knew she was instructed never to leave RM alone around children at any time. RM had been incorporated into the Popes' home for fifteen months, without incident. Brenda was at the end of a hallway, eight feet away from the open doorway to RM's room, having instructed the child to sit in the doorway and provided activities for her there, and both RM and the child were in her view. There were at least three other adults in the house at the time. While it is unclear whether the final order credits the time span of "two minutes," it is undeniable that the little girl was sexually abused.

█ Although it is undeniable that RM was not so closely supervised as to prevent him from harming the child who was visiting the Popes' home, whether that amounts to negligent supervision of *him* under the Adult and Long–Term Care Facility Resident Maltreatment Act (Ark. Code Ann. §§ 12–12–1701 to 1722 (Repl. 2009 & Supp.2011)) is an entirely different question. Negligence, generally, is defined as the failure to do something that a reasonably careful person would do, or the doing of something that a reasonably careful person would not do. *See, e.g., Sam-*

*mons v. SEECO, Inc.*, 2012 Ark. App. 650, 425 S.W.3d 38. Neglect is defined in pertinent part in Arkansas Code Annotated section 12–12–1703(15)(B) as:

> An act or omission by a caregiver responsible for the care and supervision of an endangered person or *an impaired person constituting:* (i) *negligently failing to provide* necessary treatment, rehabilitation, care, food, clothing, shelter, *supervision,* or medical services to an endangered person or *an impaired person* [.]

(Emphasis added.) The Act and, in particular this statute, is clearly designed for the protection of the impaired person. Here, that person would be RM.

Moreover, as explained by Clara Palmer, the purpose of the Medicaid-waiver program is to allow the impaired person to exist in the *most normal setting possible, i.e., to live in the least restrictive setting possible.* Here, DHS was on notice of RM's problems because he had in fact already been removed once from another home under this program for abusing a child. Yet, DHS, with this knowledge, persisted in placing him in the Popes' home, which was undisputedly *not* child free. It begs the question to ask if, rather than Brenda, it was not DHS that failed to exercise good judgment in placing RM—a second time—in a "least restrictive setting," after his first such placement resulted in similar child abuse. Because it is the impaired person who abused a child, not the other way around, in our opinion DHS had to stretch the statute beyond its bounds to find that RM had been harmed under these circumstances. The harm to RM asserted by DHS was that he was "incarcerated" as a result of Brenda's maltreatment/negligent supervision of *him.* Put another way, however, RM was simply reassigned to a more restrictive setting because the purpose of the Medicaid-waiver program did not work for him in either the first or the second placement.

We fully recognize that the standard of review in these cases is difficult for an appellant to surmount. And it should be. However, that does not mean that our review is meaningless. The DHS decision we are reviewing is based on a determination that *RM* was harmed, *i.e.,* "incarcerated," by Brenda's "negligent supervision," resulting in her placement on an *Adult Abuse Registry.* We conclude that this basic premise of the DHS decision is faulty and is not supported by substantial evidence. Rather, it is clear from our review that it was the child, *not* RM, who was harmed. Thus, this case is presented to us with a tortured application of a statute that is designed to protect the impaired person in a situation where the impaired person was not harmed. Although an agency's interpretation of a statute is highly persuasive, if the statute is not ambiguous, we will not interpret it to mean anything other than what it says. *Arkansas Dep't of Human Servs. v. Parker,* 88 Ark. App. 222, 197 S.W.3d 33 (2004). We hold that there was not substantial evidence to support the agency's decision that Brenda negligently supervised *RM,* especially where it was a third party, and not RM, who was actually harmed. RM was not "left alone" with the child, unsupervised, in a fashion that constitutes negligence, especially under the statute relied upon by DHS. Moreover, we conclude that applying this negligent-supervision statute under these circumstances was arbitrary, capricious, and an abuse of discretion. We therefore reverse the agency's decision and affirm the circuit court's order.

HARRISON, WHITEAKER, and BROWN, JJ., agree.

GRUBER and VAUGHT, JJ., dissent.

LARRY D. VAUGHT, Judge, dissenting.

The majority opinion's focus is misplaced in this case. The issue presented is

not whether the Arkansas Department of Human Services (DHS) was negligent in placing R.M. with the Popes. And while Pope's goddaughter is undoubtedly and unfortunately a victim in this scenario, we must keep in mind that this case is about R.M. and whether Pope neglected him pursuant to the Adult and Long–Term Care Facility Resident Maltreatment Act. On that issue, the administrative law judge (ALJ) concluded that "there was a preponderance of the evidence to show that Pope neglected R.M. by failing to provide the necessary supervision to R.M., an impaired person." Our review is of the administrative decision and not that of the trial court. *Ark. Dep't of Human Servs. v. Koprovic,* 2012 Ark. App. 645, at 6, 2012 WL 5438952. And it is well settled that we must affirm the decision of an administrative agency if there is substantial evidence of record to support it and it is not arbitrary, capricious, or characterized by an abuse of discretion. *Files v. Ark. State Highway & Transp. Dep't,* 325 Ark. 291, 299, 925 S.W.2d 404, 409 (1996); *Fontana v. Gunter,* 11 Ark.App. 214, 215, 669 S.W.2d 487, 488 (1984); *see also* Ark.Code Ann. § 25–15–212(h)(5), (6) (Repl.2002). Because substantial evidence supports the ALJ's decision that R.M. was neglected as a result of the sexual-abuse incident and that Pope's supervision was not reasonable, I would affirm the decision and reverse the trial court. Therefore, I dissent.

The ALJ's finding of negligence was primarily based on Pope's testimony admitting that she was aware of R.M.'s 2009 sexual contact with a four-year-old minor, that she was told by ICM that R.M. was to "never be left alone with children at any time," and that her goddaughter was alone in a room with R.M. Further evidence of negligent supervision cited by the ALJ was the actual sexual abuse R.M. perpetrated against Pope's five-year-old goddaughter while she was alone with him in his room and R.M.'s incarceration and reassignment to a more restrictive setting following the incident.

Pope insists that other evidence in this case establishes that she was supervising R.M. at the time of the incident. She cites evidence that she denied her goddaughter's request to go into R.M.'s room when Pope was in the living room with visitors; she required her goddaughter to sit in the doorway of R.M.'s room, about eight feet away from Pope; and while visiting with company, Pope was also watching the child. She contends that she looked away only for a couple of minutes. She argues, "If losing sight of a child for a period of two (2) minutes could be deemed neglect, every parent in the world would be guilty of neglect under the rigorous standard DHS is attempting to impose."

However, this case is not about what amount of supervision "every parent in the world" should be providing their children. Rather, this case is about the amount of supervision Pope was required to provide R.M. And despite the fact that the ALJ assumed the facts relied on by Pope to be true, it still found that she was negligent in her supervision of R.M. based on the undisputed evidence that she knew of R.M.'s proclivity to engage in sexual misconduct with children, she knew R.M. had to be supervised at all times in the presence of children, she did not supervise R.M. for a period of at least two minutes when he was left alone in his bedroom with a child, and in that time period R.M. sexually abused the child. These undisputed facts constitute substantial evidence supporting the ALJ's decision that Pope negligently supervised R.M. In other words, these undisputed facts constitute valid, legal, and persuasive evidence that a reasonable mind might accept to support the ALJ's decision and force the mind to pass beyond conjecture. *Olsten Health Servs., Inc. v. Ark.*

*Health Servs. Comm'n,* 69 Ark.App. 313, 320, 12 S.W.3d 656, 661 (2000).

I would further hold that the ALJ's finding was not an abuse of its discretion. To establish an abuse of discretion, it must be shown that the agency's discretion was improvidently exercised, i.e., exercised thoughtlessly and without due consideration. *Koprovic,* 2012 Ark. App. 645, at 7, 2012 WL 5438952. It is the prerogative of the agency to believe or disbelieve any witness and also to decide what weight to accord the evidence. *Id.* There is no evidence in this case that the ALJ exercised its discretion improvidently or without due consideration. To the contrary, the ALJ held a hearing and accepted testimony from multiple witnesses. The ALJ's final order is five-and-a-half pages long, and it includes citations to documentary evidence and statutory authority, multiple findings of fact, and conclusions of law. Furthermore, it is a decision supported by substantial evidence.

In sum, the ALJ found that Pope negligently supervised R.M. by permitting him, an impaired person, to be in the position to act out a known propensity for abuse. As a result, R.M. was harmed. He was incarcerated and then reassigned to a more restrictive setting. The undisputed and substantial evidence supports the ALJ's conclusion.

Accordingly, I dissent.

GRUBER, J., joins.